# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION

## CIVIL CASE NO. 1:11cv95

STEPHANIE CROCKETT,     )
                                )

       **Plaintiff,**      )
                                )

       **vs.**           )
                                )

**MISSION HOSPITAL, INC.,**     )
**a North Carolina Corporation,**   )
                                )

       **Defendant.**    )
_____)

## MEMORANDUM OF DECISION AND ORDER

**THIS MATTER** is before the Court on the Defendant's Motion for Summary Judgment [Doc. 23].

## PROCEDURAL HISTORY

The Plaintiff Stephanie Crockett (Crockett) initiated this action in state court on March 25, 2011 alleging claims against Defendant Mission Hospital, Inc. (Mission) for employment discrimination in violation of Title VII of the Civil Rights Act of 1964 in the form of sexual harassment creating a hostile work environment and retaliatory discharge as well as a state law claim for

intentional infliction of emotional distress.[1] [Doc. 1-2]. The Defendant timely removed the action to this Court on the basis of federal question jurisdiction on April 27, 2011. [Doc. 1].

The parties engaged in a period of discovery and completed mediation in accordance with the Pre-Trial Order and Case Management Plan. [Doc. 13; Doc. 16; Doc. 20; Doc. 22]. Mediation was unsuccessful and the Defendant timely moved for summary judgment. [Doc. 31; Doc. 23]. The motion is now ripe for disposition.

## STANDARD OF REVIEW

Under the Federal Rules of Civil Procedure, summary judgment shall be awarded "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, ... show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has observed, "this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."

Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003), cert. denied 541 U.S. 1042, 124 S.Ct. 2171, 158 L.Ed.2d 732 (2004)

---

[1]The Complaint also contained state law claims against Harry Kemp who had been the Plaintiff's supervisor at Mission. [Doc. 1-2]. On October 17, 2011, the parties filed a Stipulation of Dismissal as to Defendant Cathie St. John-Ritzen, Administrator CTA of the Estate of Harry Kemp, Deceased. [Doc. 15].

(emphasis in original).

A genuine issue of fact exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party. <u>Shaw v. Stroud</u>, 13 F.3d 791, 798 (4th Cir. 1994), <u>cert. denied</u> 513 U.S. 814, 115 S.Ct. 68, 130 L.Ed.2d 24 (1994) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." <u>Bouchat</u>, 346 F.3d at 522 (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue does exist. <u>Id.</u>

A party opposing a properly supported motion for summary judgment

> "may not rest upon the mere allegations or denial of [his] pleadings," but rather must "set forth specific facts showing that there is a genuine issue for trial." Furthermore, neither "[u]nsupported speculation," nor evidence that is "merely colorable" or "not significantly probative," will suffice to defeat a motion for summary judgment; rather, if the adverse party fails to bring forth facts showing that "reasonable minds could differ" on a material point, then, regardless of "[a]ny proof or evidentiary requirements imposed by the substantive law," "summary judgment, if appropriate, shall be entered."

<u>Id.</u>

Nonetheless, in considering the facts for the purposes of a summary judgment motion, the Court will view the pleadings and material presented in the light most favorable to the nonmoving party. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## FACTUAL BACKGROUND

Crockett began working in a full time capacity at Mission in 2002 as a radiologic technologist on the second shift.[2] [Doc. 25-1 at 2]. Sometime thereafter, Crockett transferred to the first shift but in February 2008, she requested and received a reassignment to the second shift where she made more money. [Id. at 2-3]. Her supervisor on the second shift was Harry Kemp (Kemp). [Id.]. Kemp remained Crockett's supervisor until his death on March 19, 2010. [Id. at 4]. Despite his title as a supervisor, Kemp did not have the authority to hire or fire any employee, including Crockett. [Doc. 25-4].

In December 2009, Crockett was counseled concerning a lack of initiative based on her documented work history and the concerns of co-workers. [Doc. 25-2 at 23]. On January 28, 2010, she was cited for a violation of the administrative policy against the use of cellular telephones and

---

[2]Most of the factual background is taken from Crockett's deposition testimony.

the misrepresentation of facts to Mission representatives. [Id.]. On February 16, 2010, she was issued a Final Warning which required an "Immediate change in behavior and any non merit behavior or misrepresentation of fact. Use of cellular device while working and not on break is not acceptable." [Id.]. The consequence of any further misconduct was disclosed as termination. [Id.]. Crockett signed the Final Warning. [Id. at 24]. Kemp was not involved in the decision to issue a Final Warning. [Doc. 25-4].

On February 18, 2010, Crockett saw Kemp in the break room when she first clocked in to work. [Doc. 25-1 at 6]. When Kemp took out a copy of the Final Warning which had been issued to Crockett, she asked if she could speak with him about the situation. [Id.]. He agreed to do so but she asked if they might speak later in a non-public area of the department. [Id. at 6-7].

About 8:30 p.m. on that same date, Kemp came to get Crockett from the diagnostic area of the radiology department so that they could talk. [Id. at 7-8]. Kemp led Crockett to an office which was no longer occupied and when Crockett asked why they were going to that office, Kemp replied that he thought his office had been bugged. [Id.]. When they entered the office, Kemp closed and locked the door. [Id. at 11]. Kemp told Crockett that she had almost gotten him into a lot of trouble because she had complained that

her performance evaluation scores had been changed by a supervisor in a position superior to Kemp.  [Id. at 11-12].  Kemp then told Crockett that since he could no longer trust her, she needed to prove to him that she was not wearing a wire and recording the conversation.  [Id.].  Kemp said that he had some information for Crockett about her job but he would not repeat it without her proving that she was not wearing a wire.  [Id.].  Kemp and Crockett went back and forth for about twenty minutes on the issue of whether or not she was wearing a wire and whether she would prove that to him by lifting her clothing.  [Id. at 13-14].  During that conversation, Kemp told Crockett that he had been given her termination papers.  [Id.].  Crockett felt that if she did not prove she was not wearing a wire, Kemp would fire her on the spot.  [Id.].  Crockett had been told in her corrective action meeting that this was her final warning and if she "so much as hiccuped"she would be fired.  [Id. at 17].

Finally, Kemp lifted his shirt to show that he was not wearing a wire and offered to remove his trousers down to his shorts, an offer refused by Crockett.  [Id. at 14-15].  Crockett asked why she couldn't lift her shirt in front of female technician instead of Kemp but he said he did not want to get anyone else involved.  [Id. at 15].  Although Crockett did not know if Kemp had the authority to actually fire her, she felt he could write her up for another

corrective action which would result in her termination.  [Id. at 16].  Kemp told her that he was a happily married man and they just needed to get the wire issue resolved.  [Id. at 17].  Crockett began crying but finally lifted her shirt as fast as she possibly could to expose her bra.  [Id.].  Kemp still was not satisfied so she finally lifted her bra a little to expose the underside of her breasts.  [Id. at 19-20].  She was not sure if her nipples had been exposed or not.  [Id.].  Kemp did not make any sexual overtures to her and did not make any comment about her breasts.  [Id. at 20].  He calmly stated that they were now able to speak.  [Id. at 21].

Crockett had continued to cry throughout this time.  [Id.].  Kemp pulled his chair in front of the chair that Crockett was sitting in and placed his legs on the outside of her legs.  [Id. at 22].  Kemp reiterated that Crockett was in a lot of trouble and should not have complained to Human Resources (HR) that Chris Chandler had changed the scores on her performance evaluation.[3]  [Id. at 22-24].  Kemp told Crockett that he was the only person she could trust. [Id.].  At the end of an approximately thirty minute conversation, Crockett asked what else he wanted to tell her and Kemp replied that she should only trust him. [Id.].  Kemp then stated that they should "seal it with a kiss."  [Id. at

---

[3]Chandler was in a supervisory position above Kemp. [Id. at 4].

25].  Crockett refused to kiss him but did say, "How about a hug" while she leaned forward to pat him on the back.  [Id. at 26].  As Crockett turned away, Kemp kissed her right check and said "I've always wanted just one kiss."  [Id.].  Crockett again refused and as she turned her head, he kissed her cheek again.  [Id.].  Kemp then said, "You're not going to tell anybody, are you?" to which Crockett replied that she would not.  [Id.].  Later that night, Kemp again sought reassurance that Crockett would not report the incident and on two more occasions asked for a kiss. [Doc. 29-1 at 58-60].

Prior to the incident on February 18, 2010, Kemp had never made any overtures of any kind toward Crockett. [Doc. 25-1 at 33].  He had never attempted to kiss her, never asked her on a date, never made any sexual advances of any kind toward her, never told dirty jokes and never made sexual innuendos to or around her.  [Id.].

Crockett was upset about the incident and asked Kemp if she could leave work one hour early.  [Id. at 33-34].  Her request was granted but she did not contact anyone in HR or management about the incident.  [Id. at 35].  Crockett then took leave pursuant to the Family Medical Leave Act from February 19 through 24, 2010.  [Id.].  On February 19, 2010, she retained an attorney. [Doc. 1-2 at 3].

When Crockett returned to work on February 25, 2010, she was summoned to a meeting with Teresa McCarthy (McCarthy) of HR and Kathy Jones (Jones), the director of her department. [Doc. 25-1 at 36-37]. She was told that Kemp had reported continued misuse by Crockett of her cell phone and accused her of "flashing" him with her shirt in order to persuade him not to report the misuse. [Id.]. In response to these accusations, Crockett told them that Kemp had done something "horrific" to her and was trying to cover it up. [Id.]. Crockett refused, however, to elaborate stating that her lawyer had advised her not to do so. [Id.]. Crockett also did not tell anyone in management at Mission about the incident. [Id. at 40]. At the conclusion of the meeting, Crockett took Jones to her locker in order to prove that her cell phone was in the locker and had not been used. [Id. at 41]. Jones told Crockett that she would "get to the bottom of this" but placed Crockett on suspension pending the conclusion of the investigation. [Id.]. Crockett remained on suspension until March 8, 2010. [Id. at 42].

On February 26, 2010, McCarthy and Karen Ensley, another HR representative, met with Kemp about Crockett's allegation that he had done something "horrific" to her.[4] [Doc. 25-3 at 2-3]. Kemp denied that anything

---

[4]McCarthy provided this information by affidavit. [Doc. 25-3].

unusual had occurred between the two. [Id.].

On March 1, 2010, McCarthy asked Crockett to come in to speak with her and Ensley. [Doc. 25-1 at 42]. Ensley asked if the incident of February 18, 2010 had involved Kemp's making of sexual advances toward Crockett. [Id.]. Crockett nodded yes. [Id.]. She refused, however, to provide any additional details. [Id.]. During that meeting, Crockett was provided with a copy of Mission's HR 5.04 Harassment/Discrimination/Retaliation policy and advised of the process used to report a claim of harassment or discrimination. [Doc. 25-3 at 3]. Crockett again refused to prove any details or to file a formal complaint. [Id.].

McCarthy and Ensley also met with Chandler on March 1, 2010 to ascertain what, if any, information he had about the February 18 and February 25, 2010 incidents. [Id. at 4]. Chandler stated that he had seen both Crockett and Kemp on February 18 but that nothing seemed to be out of the ordinary.[5] [Doc. 25-6]. He also stated that Crockett had not reported any such incident to him. [Id.].

Over the next couple of days, McCarthy interviewed co-workers to see if anyone had witnessed or knew about the February 18 incident. [Doc. 25-3

---

[5]Chandler provided this information by affidavit. [Doc. 25-6].

at 1-4]. They interviewed five different co-workers to ascertain if anything unusual had been seen or reported.[6] [Id. at 4-6].

McCarthy and Ensley had another meeting with Crockett on March 5, 2010 during which they told her that she could return to work on March 8, 2010. [Doc. 25-1 at 43]. Crockett was told that their investigation had failed to substantiate Kemp's claims of misconduct and therefore, she was allowed to return to work. [Id. at 50]. Crockett thought they were going to transfer her so that Kemp would not be her supervisor but she was told that Kemp would remain her superior. [Id.]. When Crockett pleaded with them not to make her work for Kemp, she was told that if she did not report to work on March 8, she would be terminated. [Id.]. Crockett acknowledged that an employee who was in corrective action, such as she, was not eligible for a transfer. [Id. at 57].

Crockett acknowledged that the HR representatives investigated the February 18 incident while she was under suspension and also admitted that she refused to tell them any further details about what had occurred. [Id. at 47-49]. Crockett nonetheless felt that Mission had not adequately responded

---

[6]Although the content of the statements made to McCarthy by co-workers has been included in her affidavit, they are hearsay and therefore have not been considered.

to the situation because Kemp was to continue to be her supervisor.  [Id. at 60].

On March 8, 2010, McCarthy, Jones and Chandler met with Kemp to review the allegations contained in Crockett's EEOC Charge which had been received by that time at Mission. [Doc. 25-3 at 7-8].  Kemp continued to deny that anything unusual had occurred. [Id.].

When Crockett returned to work on March 8 , 2010, she was told that both she and Kemp were instructed to conduct themselves as "business as usual." [Doc. 25-1 at 58].  Crockett asked whether Mission had received her Equal Employment Opportunity Commission (EEOC) charge and was told that the complaint had been received.  [Id.].

On March 9, 2010, Crockett finally completed Mission's form complaint to report the incident with Kemp.  [Id. at 62].  In that form, however, Crockett merely wrote that reference should be made to her EEOC Charge.  [Id. at 63].

After Crockett returned to work on March 8, 2010, she did not experience any further harassing treatment from Kemp. [Id. at 66].  On March 17, 2010, Crockett had a meeting with McCarthy during which Crockett disclosed that she had surreptitiously tape recorded her conversations with Kemp on February 25, 2010.  [Id. at 67-69].  During that meeting, Crockett for

the first time told HR the complete details of the February 18, 2010 incident. [Id.].

McCarthy met with Kemp a third time on March 18, 2010 and he once again denied the allegations. [Doc 25-3 at 10]. After that meeting, Kemp left work and committed suicide. [Doc. 28].

McCarthy also met with Crockett on March 18, 2010 at which time Crockett played the tape recording she had made on February 25, 2010. [Doc. 25-1 at 70-72]. Crockett had left the recorder functioning while she was treating and working with patients on February 25, 2010. [Doc. 25-2 at 2-5]. She therefore surreptitiously recorded conversations with and statements made by patients. [Id.]. In fact, Crockett tape recorded the meeting which she had with McCarthy on March 17, 2010, again without McCarthy's knowledge. [Id. at 6-7]. At one point towards the end of the March 18 meeting, McCarthy asked if Crockett was recording the meeting and Crockett admitted that she was doing so. [Id.].

On March 24, 2010, Crockett was terminated for tape recording her interactions with patients in violation of the Health Insurance Portability and Accountability Act (HIPAA) and for secretly tape recording her co-workers as well as the meeting with McCarthy. [Id. at 8-9]. Crockett acknowledged that

Mission had a policy against such disclosures contained within its employee handbooks and stated that she knew violations thereof could result in the termination of employment as well as civil and criminal penalties. [Doc. 25-2 at 16-17]. Crockett also admitted that Mission's harassment and discrimination policy contained a prohibition against tape recording investigatory interviews conducted by HR and/or management after a complaint of harassment or discrimination. [Id. at 18-21].

The termination document contains the following reasons for Crockett's termination:

> Violation of 5.01 corrective action. Taping of patients and co-workers was a violation of MERIT[7] [standards], was done without the consent of the patient, and was in violation of the Patients' Rights and Responsibilities policy. Certainly does not respect the dignity and privacy of a patient when his or her procedure is being secretly tape recorded. Patient names and procedures are recorded. Her actions in taping her co-workers and patients do not represent Mission's Core Values of Mercy, Excellence, Respect, Integrity and Trust. Tape recording of patient procedures, particularly where information identifying the patient and the procedure they are undergoing, is at minimum a violation of Mission's Confidentiality, Privacy and Security Policy HR 1.04, the Patients' Rights and Responsibilities Policy, and worst case scenario a HIPAA violation and HR Policy 5.01 Corrective Action Admin. 300.010 and 300.014.

[Id. at 11; Doc. 25-4 at 10].

---

[7]This acronym reflects the "core values of Mercy, Excellence, Respect, Integrity and Trust" established by Mission. [Id. at 13].

## DISCUSSION

**The claims for intentional infliction of emotional distress and retaliation.**

The Plaintiff has conceded that each of these claims should be dismissed. [Doc. 28 at 18-19]. As a result, no further discussion of them is warranted and they will be dismissed.

**The claim for hostile work environment based on sexual harassment.**

Crockett's only remaining claim is for hostile work environment based on sexual harassment. "To demonstrate ... a hostile work environment [based on sexual harassment], a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff's sex ...; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." Mosby-Grant v. City of Hagerstown, 630 F.3d 326, 334 (4th Cir. 2010) (internal quotation and citation omitted). Only the third and fourth elements are at issue since the parties concede that the Plaintiff's forecast of evidence regarding Kemp's conduct fulfills the elements of being unwelcome and based on Crockett's sex.

Mission argues that Kemp's one time harassment of Crockett on February 18, 2010 does not rise to the level of frequency and severity

necessary to alter Crockett's conditions of employment and thus to create an abusive work environment. Crockett responds that Kemp's conduct was not limited to that date, noting that Kemp later falsely accused Crockett of using her cell phone on February 25, 2010 and then flashing him in an attempt to persuade him not to report that usage. [Doc. 28 at 13]. That behavior, it is argued, led to Crockett's suspension which altered the conditions of her employment. [Id.].

Before a plaintiff may file a lawsuit alleging employment discrimination in violation of Title VII, she must first exhaust administrative remedies by filing a timely charge with the EEOC. 42 U.S.C. §2000e-5; Jones v. Calvert Group, Ltd., 551 F.3d 297, 300 (4th Cir. 2009); Davis v. Va. Commw. Univ., 180 F.3d 626, 628 n.3 (4th Cir. 1999); Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 963 (4th Cir. 1996). "[T]he allegations contained in the administrative charge of discrimination [before the EEOC] generally operate to limit the scope of any subsequent judicial complaint." Chacko v. Patuxent Institution, 429 F.3d 505, 509 (4th Cir. 2005) (quoting Evans, 80 F.3d at 963). The Fourth Circuit Court of Appeals has "ma[d]e clear that the factual allegations in formal litigation must correspond to those set forth in the administrative charge." Id. Crockett's EEOC Charge is limited to the incident which occurred on February

18, 2010. [Doc. 32-1 at 3-4]. There is nothing in the Charge concerning subsequent harassing conduct by Kemp and it is undisputed that the Charge was not amended. Thus, any claim that such subsequent conduct contributed to an abusive environment is beyond the scope of the Charge and may not be pursued. Clarke v. O'Neil, 81 F. App'x. 775 (4th Cir. 2003).

In order to determine whether workplace harassment was so severe as to alter the conditions of employment, the totality of the circumstances must be considered. Okoli v. City of Baltimore, 648 F.3d 216, 220 (4th Cir. 2011). Crockett "must show not only that she subjectively found her work environment to be hostile or abusive but also that an objectively reasonable person would have found it to be so. Harris v. Mayor and City Council of Baltimore, 429 F. App'x. 195, 201 (4th Cir. 2011) (citing Hoyle v. Freightliner, LLC, 650 F.3d 321, 333 (4th Cir. 2011)). Mission claims the isolated conduct which occurred on February 18, 2010 does not rise to the level of severity or pervasiveness that would cause an objectively reasonable person to find the work environment hostile. Crockett argues that this single incident was so severe as to rise to that level.

In considering the totality of the circumstances, the Court must include "the frequency of the discriminatory conduct; its severity; whether it is

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Okoli, 648 F.3d at 220 (internal quotation and citation omitted). A single incident of sexual harassment can be actionable if it is "extraordinarily severe." Id. at n.5. In Whitten v. Fred's, Inc., 601 F.3d 231 (4th Cir. 2010), the United States Court of Appeals for the Fourth Circuit considered harassment which occurred over a two day period consisting of verbal abuse and two incidents of a supervisor pressing his genitals against the plaintiff's body.[8]

> Under these circumstances, it is enough for us to note that Whitten's evidence, which shows that she was subjected to verbal abuse and, most importantly, to physical assaults of a highly sexual and offensive nature, is sufficient to create a question of fact as to the first three elements of [a hostile work environment] claim. While two days of verbal abuse of the type at issue here could not, in and of itself, support a hostile environment claim, that conduct combined with the physical assaults [over the two day period] is sufficiently severe that it reasonably could be viewed as creating an abusive work environment.

Id. at 243. Summary judgment was therefore inappropriate. Id.

Kemp's conduct of forcibly kissing Crockett is equally as severe as the supervisor's conduct in Whitten of pressing his genitals into the plaintiff's body. Based on this recent Circuit precedent, Crockett has presented

---

[8]In Whitten, the plaintiff raised only state law claims. The Fourth Circuit analyzed the case pursuant to Title VII precedent. Whitten, 601 F.3d at 242.

sufficient evidence to create a question of fact as to this issue.  Id.; Balas v.

Huntington Ingalls Indus., 2011 WL 4478864 (E.D.Va. 2011) (single hug

qualified).

 Crockett's case "therefore turns on the fourth element - whether there

is a basis for imputing to [Mission] liability for the conduct of" Kemp.  Whitten,

601 F.3d at 243.  "If the plaintiff's claim is based on the actions of her

supervisor, the employer is subject to vicarious liability.  If the plaintiff did not

suffer a tangible employment action, the employer has available to it an

affirmative defense that may protect it from liability or damages."  Id. (citing

Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765, 118 S.Ct. 2257, 141

L.Ed.2d 633 (1998)) (other citations omitted).  The question is therefore

whether Crockett suffered a tangible employment action.

Crockett does not claim that her termination constituted a tangible

employment action.  Indeed, the record is undisputed that she was terminated

for surreptitiously tape recording patients and McCarthy.  She does, however,

claim that her seven day suspension was a tangible employment action.[9]

> A tangible employment action constitutes a significant change in
> employment status, such as hiring, firing, failing to promote,
> reassignment with significantly different responsibilities, or a

---

[9]This incident was not contained within the EEOC Charge.  It is nonetheless
considered in the interest of finality.

decision causing a significant change in benefits.

Ellerth, 524 U.S. at 761.

When the change is temporary and has a *de minimis* impact, it is not a tangible employment action. White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789, 795 (6th Cir.), affirmed 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006); Evans v. Williamsburg Technical College, 2007 WL 1068183 (D.S.C.), affirmed 262 F. App'x. 495 (4th Cir. 2008); Cole v. Anne Arundel County Bd. of Educ., 2006 WL 3626888 (D.Md. 2006). A change involving termination or suspension without pay, however, can constitute such an action. Howington v. Quality Restaurant Concepts, LLC, 298 F. App'x. 436, 442 (6th Cir. 2008). While Crockett has argued that she was suspended without pay she has failed to present any forecast of evidence of such suspension. As such, she has failed to refute Mission's claim that she did not suffer a tangible employment action. Quillin v. C.B. Fleet Holding Co., Inc., 328 F. App'x. 195, 201 (4th Cir. 2009).

In any event, Crockett cannot show that she suffered a tangible employment action because she has presented no evidence of a causal relationship between Kemp's sexual harassment and her temporary suspension. Ellerth, 524 U.S. at 762 (tangible employment actions "are the

means by which the supervisor brings the official power of the enterprise to bear on subordinates."). It is undisputed that at the time of her suspension, Crockett had been given a Final Warning concerning her unauthorized and improper use of cell phones. The decision to suspend her when another allegation of unauthorized phone usage was received was not made by Kemp but by McCarthy and Jones. Sanford v. Main Street Baptist Church Manor, Inc., 327 F. App'x. 587, 598 (6th Cir. 2009). Kemp thus had no role in the decision to suspend Crockett. Id.; Idusuyi v. State of Tennessee Department of Children's Services, 30 F. App'x. 398, 401 (6th Cir. 2002); Brown v. Perry, 184 F.3d 388, 395 (4th Cir. 1999). Indeed, the evidence is unrefuted that Kemp had no authority to hire or fire any employee, including Crockett.[10] Hill v. Lockheed Martin Logistics Management, Inc., 354 F.3d 277, 291 (4th Cir.), cert. dismissed 543 U.S. 1132, 125 S.Ct. 1115, 160 L.Ed.2d 1090 (2005) (to survive summary judgment plaintiff must "come forward with sufficient evidence that the subordinate employee possessed such authority as to be viewed as the one principally responsible for the decision or the actual

---

[10]Crockett first testified that Kemp could fire her but later admitted in her deposition that she did not know if Kemp could fire her. "[A] genuine issue of material fact is not created where the only issue of fact is to determine which of two conflicting versions of plaintiff's testimony is correct." S.P. v. The City of Takoma Park, 134 F.3d 260, 273 n.12 (4th Cir. 1998).

decisionmaker for the employer").

Moreover, to prove causation, Crockett must show that she was suspended *because* of Kemp's sexual harassment of her.  Sanford, 327 F. App'x. at 599.  "Tangible employment actions, if not taken for discriminatory reasons, do not vitiate the affirmative defense."  Lissau v. Southern Food Service, Inc., 159 F.3d 177, 182 (4th Cir. 1998).  "If [Crockett's suspension] did not result from [her] refusal to submit to [Kemp's] sexual harassment, then [Mission] may advance this defense."  Id.  The suspension here was imposed by McCarthy and Jones so that they could investigate the allegation of unauthorized cell phone use, not because Crockett had refused Kemp's sexual harassment.  Id.  Indeed, at the time of the suspension, Crockett had not told anyone at Mission that Kemp had engaged in such conduct.  During the February 25, 2010 meeting, Crockett stated that Kemp had done something "horrific" but she refused to disclose what he had done.  McCarthy and Jones were therefore ignorant of the harassment.  Swann v. Source One Staffing Solutions, 778 F.Supp.2d 611, 619-20 (E.D.N.C. 2011).  Crockett surmised that Kemp made the accusation of phone use and "flashing" in order to cover up his insistence that she lift her shirt in order to prove she was not wearing a wire.  Assuming Kemp did so, however, he did not make the

decision to suspend Crockett.  <u>Hill</u>, 354 F.3d at 291 ("we decline to endorse a construction of the discrimination statutes that would allow a biased subordinate who has no supervisory or disciplinary authority and who does not make the final ... decision to become a decisionmaker simply because he had ... influence on the ultimate decision or because he has played a role" in the employment action).  Moreover, Crockett's mere speculation that Kemp did so is insufficient to withstand summary judgment.  <u>Othentec Ltd. v. Phelan</u>, 526 F.3d 135, 140 (4th Cir. 2008) ("mere speculation or the building of one inference upon another" will not resist summary judgment).  It is undisputed that McCarthy and Jones suspended Crockett because of a report of unauthorized phone usage, not because she had refused sexual advances about which they were ignorant.

Since the Plaintiff has failed to show that she suffered a tangible employment action, Mission is entitled to assert the <u>Ellerth</u> affirmative defense to defeat liability provided that it proves by a preponderance of the evidence (1) that the employer "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and (2) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  <u>Ellerth</u>,

524 U.S. at 765. The evidence relevant to each of these prongs is intertwined.

Crockett has conceded that Mission "established, disseminated and enforced an anti-harassment policy and complaint procedure and took reasonable steps to prevent harassment." [Doc. 28 at 15]. She nonetheless claims that Mission failed to correct Kemp's harassment promptly. This occurred, she argues, when on February 25, 2010, Mission suspended Crockett rather than investigate her vague allegation that Kemp had done something "horrific" to her. Mission's failure was exacerbated, according to Crockett, when McCarthy refused to transfer her so that Kemp would no longer be her supervisor.[11]

The uncontradicted evidence, however, is contrary to Crockett's argument. McCarthy, Jones and Ensley immediately began an investigation on February 25, 2010 as soon as Crockett accused Kemp of "horrific" behavior toward her, despite the fact that she refused to provide any further details or information.[12] On February 26, 2010, they met with Kemp who

---

[11]Crockett has also made an allegation that Kemp instructed three co-workers to make formal complaints against her on March 8, 2010 when her suspension was ended and she returned to work. These allegations are based on speculation and constitute hearsay and therefore have not been considered. Fed.R.Evid. 802.

[12]In fact, Crockett implicitly admits that she hindered any investigation by stating the she was "unfortunately" told by her attorney not to be forthcoming with HR. [Doc. 28

denied that he had done anything (Doc. 25-5) and since Crockett had refused to provide any information their attempts to investigate specific facts were thwarted.  Caldwell v. Johnson, 289 F. App'x. 579, 586 (4th Cir. 2008) ("The EPA was not made aware of a hostile work environment, and therefore could not have taken 'prompt remedial actions.'").

Mission's HR and management officials continued to press on with an investigation, despite not having the benefit of the facts.  On March 1, 2010, they met with Crockett again and attempted to elicit whether Kemp's conduct had involved sexual advances.  Although Crockett nodded yes, she refused to provide details. At that time, she was counseled in the procedure for filing a formal complaint and provided a copy of the sexual harassment policy.[13] "[D]istribution of an anti-harassment policy provides compelling proof that the company exercised reasonable care in ... promptly correcting sexual harassment."  Barret v. Applied Radiant Energy Corp., 240 F.3d 262, 266 (4th Cir. 2001).

McCarthy and other Mission representatives met with Crockett again on March 5 and 8, 2010 in attempts to resolve the issue but she continued to

_____

at 16-17].

[13]The parties do not dispute that Crockett received training each year in the procedure for reporting sexual harassment. [Doc. 24 at 17; Doc. 28 at 15].

refuse to disclose details. "If Title VII's prohibitions against sexual harassment are to be effective, employees must report improper behavior to company officials." Matvia v. Bald Head Island Management, Inc., 259 F.3d 261, 269 (4th Cir. 2001). Although Crockett finally signed a Mission harassment complaint on March 9, 2010, she merely referenced her EEOC Charge. Nonetheless, McCarthy continued the investigation. It was not until March 17, 2010, however, that Crockett finally discussed with McCarthy and Jones the details of the February 18, 2010 incident. Since Crockett had refused to provide details, Mission could not take any step other than the investigation which promptly occurred. "[T]he law against sexual harassment is not self-enforcing and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists." Parkins v. Civil Constructors, Inc., 163 F.3d 1027, 1038 (7th Cir. 1998) (internal quotation marks omitted).

McCarthy and other representatives met with Kemp on March 8 to review the allegations of Crockett's EEOC Charge. Swann, 778 F.Supp.2d at 621(upon receiving copy of EEOC charge, employer conducted even more extensive investigation). In the meantime, McCarthy and Jones had interviewed co-workers in an attempt to learn if anyone had witnessed the

events of February 18, 2010, heard anything or suspected anything based on the conduct of Kemp and Crockett that night. [Doc. 25-3; Doc. 25-4; Doc. 25-5; Doc. 25-6]. Kemp was interviewed a third time on March 18, 2010 and continued to deny Crockett's allegations.

In the face of this prompt and thorough investigation, Crockett maintains the position that Mission should have transferred her to another shift so that she would not have any contact with Kemp. This argument, however, ignores the facts which Plaintiff admits. First, during this period she was not cooperating with the investigation. She had provided no facts that would support her transfer. Second, she was ineligible for transfer because she was in final warning status. In short, Plaintiff argues that Mission should have modified its transfer policies at her behest based on an allegation that Plaintiff was not herself willing to substantiate.[14] Barrett , 240 F.3d at 267 (employer immediately launched an investigation and after *confirming* the harassment, fired supervisor); Shaw v. AutoZone, Inc., 180 F.3d 806, 812 (7th Cir.), cert. denied 528 U.S. 1076, 120 S.Ct. 790, 145 L.Ed.2d 666 (2000) ("Because Shaw never informed AutoZone of Noble's alleged harassment ... there was

---

[14] Plaintiff finally disclosed some facts supporting her accusations on March 17, 2010, but Kemp's suicide the following day rendered it impossible for Mission to take any further action against him.

nothing for AutoZone to respond to.").

The second prong of this affirmative defense is that Crockett unreasonably failed to take advantage of the corrective opportunities provided by Mission.[15] "[P]roof that a plaintiff employee failed to follow a complaint procedure will normally suffice to satisfy the employer's burden under the second element of the defense." Brown, 184 F.3d at 395. Indeed, Crockett has conceded this issue in her responsive brief: "The Defendant contends that the Plaintiff should have given more details of the events of February 18 *and she should have*. However, even if she had done so, *it is unlikely* that the Defendant would have taken a different course of action."[16] [Doc. 28 at 18] (emphasis provided). Speculation as to Mission's future course of conduct after an investigation is insufficient to withstand summary judgment. Barrett, 240 F.3d at 267-68 (advancing a speculative fear of retaliation does not excuse failure to report). The excuse that reporting the conduct would not have done any good has been rejected by the Fourth Circuit. Id. "An

_____

[15]As previously noted, much of the evidence showing that Mission acted promptly to correct the situation also shows that Crockett unreasonably failed to take advantage of Mission's corrective opportunities.

[16]This concession overrides Crockett's statements that she refused to disclose details of the harassment on the advice of her lawyer. Such a claim would have been futile in any event since reporting the details of the harassment to her attorney instead of to someone having supervisory authority over her is insufficient. Barrett, 240 F.3d at 264-65.

employee's subjective belief in the futility of reporting a harasser's behavior is not a reasonable basis for failing to take advantage of any preventive or corrective opportunities provided by the employer." Id. (citing Lissau, 159 F.3d at 182); Walton v. North Carolina Dept. of Agriculture and Consumer Services, 2011 WL 5974560 (E.D.N.C. 2011).

Crockett therefore concedes the facts establishing that she unreasonably failed to take advantage of the preventive and corrective opportunities provided by Mission. As a result, it is unnecessary to reach the issue of whether she also unreasonably failed to avoid harm. Brown, 184 F.3d at 297. Having established as a matter of law each prong of the Ellerth affirmative defense, summary judgment is appropriate and this action must be dismissed.

### ORDER

**IT IS, THEREFORE, ORDERED** that the Defendant's Motion for Summary Judgment [Doc. 23] is hereby **GRANTED** and this action is hereby **DISMISSED** with prejudice. Judgment is entered simultaneously herewith.

Signed: July 3, 2012

Martin Reidinger
United States District Judge